## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOSEPH E. MURACH )
)
   Plaintiff, )
) **C.A. No.:**
)
v )  **JURY TRIAL DEMANDED**
)
)
BAYHEALTH MEDICAL CENTER, LLC )
)
CORRECT CARE SOLUTIONS, LLC )
)
CONNECTIONS COMMUNITY )
SUPPORT PROGRAMS, INC., )
)
DAVID PIERCE; PHIL PARKER )
JAMES SCARBOROUGH )
)
   Defendants. )

## <u>COMPLAINT</u>

### THE PARTIES

1.     Plaintiff, Joseph E. Murach ("Murach"), at all relevant times, was in the custody and control of the Delaware Department of Corrections (DOC).

2.     Defendant, David Pierce ("Pierce"), at all times pertinent to this complaint, was employed as the Warden at the James T. Vaughn Correctional Center (JTVCC) by the State of Delaware Department of Correction. Accordingly, at all times relevant, he was acting under color of state law.

3.     Defendant, Phil Parker ("Parker") was, at all relevant times, a Deputy Warden at JTVCC.  Accordingly, at all times relevant, he was acting under color of state law.

4.     Defendant James Scarborough ("Scarborough") was, at all relevant times, a Deputy Warden at JTVCC.  Accordingly, at all times relevant, he was acting under color of state law.

5.     Defendant, Connections Community Support Programs, Inc. ("Connections") is a Delaware corporation with a principal place of business at 500 West 10th Street, Wilmington, Delaware 19801. Beginning on July 1, 2014, and continuing to the present, Connections has a contract with the Delaware Department of Correction ("DOC") under which Connections is "responsible for providing all facets of inmate medical services except for pharmacy responsibilities."

6.     Defendant, Correct Care Solutions LLC ("CCS") is a Delaware limited liability company with a principal place of business at 3411 Silverside Road Tatnall Building, Suite 104, Wilmington, Delaware 19810. CCS contracted with DOC to provide medical services to inmates such as Joseph E. Murach from 2012 through July 1, 2014.

7.     Defendant, Bayhealth Medical Center, Inc., is a corporation and business entity incorporated in the state of Delaware, whose agent for service of process is Bayhealth Medical Center, Inc., 640 South State Street, Dover, DE

19901.

8.    At all times that Connections and CCS were the medical care providers to DOC, they were obligated by contract and by law to provide medical health care to inmates such as Joseph E. Murach that met the standards of the local community.

9.    At all times that Bayhealth was Murach's medical provider; it was obligated by contract and by law to provide medical health care to inmates such as Joseph E. Murach that met the standards of the local community.

10.    CCS is responsible for the actions of its employees in their care and treatment of Joseph E. Murach.

11.    Connections is responsible for the actions of its employees in their care and treatment of Joseph E. Murach.

12.    Bayhealth is responsible for the actions of its employees in their care and treatment of Joseph E. Murach.

13.    Defendants, unknown individual employees of Connections and CCS, doctors at Bayhealth involved in the medical care of Joseph E. Murach, either directly or indirectly by virtue of their obligations to properly administer such care, were obligated by contract and by law to provide medical health care to inmates such as Joseph Murach that met the standards of the local community.

14.    By virtue of its contracts with DOC, Connections, CCS, and its employees were all acting under the color of law when providing medical services

to inmates, including, without limitation, Mr. Murach.

## JURISDICTION

15.     The United States District Court for the District of Delaware has

jurisdiction over the parties and claims by virtue of the pendency of a federal claim

under 42 U.S.C. §1983 and 28 U.S.C. §§ 1331 and 1343, and under the principles

of ancillary and pendent jurisdiction as well as supplemental jurisdiction provisions

of 28 U.S.C. § 1367.

## CHRONOLOGY OF MR. MURACH'S CONDITION AND LACK OF CARE

16.     Mr. Murach was originally diagnosed with Crohn's Disease at age 13

and diabetes at age 14.

17.     On June 14, 2011, Murach was incarcerated to Howard R. Young

Correctional Center.

18.     Prior to his incarceration, CCS was made aware of Murach's medical

condition and his medical needs.

19.     In February 2013, Murach became violently ill after being transported

to James T. Vaughn Correctional Center ("JTVCC").  Murach was vomiting and

blood was found in his stool.

20.     Murach was sent to the infirmary where he informed medical staff that

he had Crohn's disease.

21.     From this point on, Murach and his family continuously

informed medical staff (Defendant CCS and Connections, Pierce, Parker, and Scarbourough) that he required a yearly colonoscopy and the care of a gastroenterologist ("GI")  for specialized care because of his medical condition.

22.    Murach and his family communicated his request for a yearly colonoscopy and treatment of his Crohn's Disease to Defendants Pierce, Parker, and Scarborough.

23.    In addition, Murach and his family, specifically his father, communicated these requests to CCS and later Connections medical staff.

24.    CCS and then later Connections failed to provide Murach with a yearly colonoscopy even though they were aware he was diagnosed with Crohn's disease.

25.    A yearly colonoscopy is standard medical care for Crohn's disease to establish and maintain a medical history, prevent further damage, and prescribe/adjust medications for the patient.

26.    Instead of properly treating Murach, CCS and the later Connections staff would provide him with over the counter pain medication such as Tylenol or Motrin.

27.    In September 2013, after several phone calls, Murach was finally given his first and only colonoscopy while at JTVCC on October 22, 2013.

28.    From October 22, 2013 through his discharge, Murach did not receive a another colonoscopy.

## MURACH'S NOVEMBER 30, 2016 VISIT TO EMEGENCY ROOM

29.   On November 30, 2016, around 7 pm, Murach started to throw up bile and experience extreme cramping. As a result of Murach's condition, Correctional Officer Griffin, working the 12-8 shift in Building B Annex, called a CODE 4, placing him in a gurney and wheeled him to the infirmary.

30.   Initially, Murach was denied access to medical care at the hospital by a JTVCC shift commander, instead the nurse practitioner from Connections only provided him with anti- nausea medication and Tylenol, sent him back to his building, and told him to return to the infirmary in the morning.

31.   Murach suffered in pain for several hours until an "on call" physician assistant pressured defendants Pierce, Parker, and Scarborough to transport Murach to the emergency room at Kent General.

32.   At Kent General, Murach was provided the proper medications including but not limited to IV steroids, pain medication, and fluids to treat what was believed at the time to be a flare up of Murach's Crohn's Disease.

33.   Bayhealth reported that Murach was suffering from the following: [1]

-"Flare Up" of Crohn's Disease
-Extreme Pain in Right Lower Abdomen
-Abdominal Pain
-Unable to Eat or Drink
-Unable to see gastroenterologist.
-Bloody diarrhea.

---

1 Page 5 of Bayheath Medical Records.

34.     The Bayhealth medical records stated, "Overall findings are consistent with an acute flare-up of patient's reported Crohn's Disease with skip lesions involving the proximal transverse colon and distal descending colon. No bowel obstruction or fee air at this time." [2]

35.     A CT Scan of Murach showed a mild focal bowel wall thickening with luminal narrowing in the proximal transverse colon in the right upper abdominal quadrant which we now know was a tumor and not a luminal narrowing in the proximal transverse colon. [3]

36.     On December 1, 2016, Murach was discharged after he was able to tolerate three meals without vomiting. [4]

## MURACH'S JANUARY 2, 2017 VISIT TO EMEGENCY ROOM

37.     On January 2, 2017, Murach was again admitted to Kent General by what was believed to be a flare up of his Crohn's Disease.

38.     Bayhealth medical records show that Murach was suffering from another "flare up" of his crohn's disease, severe pain, diarrhea, and bloody dark stools". [5]

39.     The medical records specifically state that Murach was receiving "No maintenance medications for (his) crohn's disease". [6]

---

2 Page 5 of Bayheath Medical Records.
3 Page 14 of Bayheath Medical Records.
4 Page 17 of Bayheath Medical Records.

40.     A CT scan showed "severe stricturing lesion demonstrates wall thickening and surrounding fat stranding. Stricturing probably relates to crohn's." [7]

41.     The medical records reflected that "Underlying malignancy cannot be excluded." [8]

42.     Dr. Lodhavia recommended that Murach receive a colonoscopy to exclude colonic malignancy.

43.     Dr. Lodhavia suggested Murach take prednisone and maintain a clear liquid diet.

44.     Both corrections staff and Murach expressed concerns to Bayhealth that Murach's symptoms would worsen if he was discharged.

45.     Bayhealth recommended Murach undergo a colonoscopy within a month upon discharge. [9]

46.     Bayhealth records show Murach was scheduled for a colonoscopy on Febuary 6, 2017 at 8 am with Dr. Caruso in Lewes, Delaware.

47.     It was noted that Murach's "flare ups" were due to him not being treated property for his crohn's disease. [10]

48.     Murach was discharged on January 4, 2017.

---

5 Page 105 of Bayheath Medical Records.
6 Page 105 of Bayheath Medical Records.
7 Page 109 of Bayheath Medical Records.
8 Page 113 and 114 of Bayheath Medical Records.
9 Page 137 of Bayheath Medical Records.
10 Page 237 of Bayheath Medical Records.

49.     On January 5, 2017, Murach's father called Defendant Pierce about the deteriorating status of his son's health. Murach's father first spoke with Pierce's secretary Lisa and was then referred to Chelsea D. Hicks, DOC's Community Relationship Officer. Ms. Hicks stated she would talk to Murach's counselor and get him moved to the T-2 medical housing building. Hicks stated that Murach was actually already reclassified in November 2016 to be transferred to T-2 building although it had never happened. It was only after his father's call, Murach was finally transferred to the T-2 building.

50.     On January 17, 2017, Murach had a flare up around midnight which included severe stomach pains causing vomiting. Guards on the 12-8 shift in the T-2 building called Defendant Parker to get permission for Murach to be transferred to the emergency room at Kent General.

51.     Despite the guards persistently requesting to transfer Murach, Defendant Parker refused their requests and instead interrogated Murach on whether he was a drug addict due to him  visiting the hospital on so many occasions.

52.     Eventually, a Connections' Physician Assistant intervened at 3 am and called 911 to transport Murach to Kent General.

53.     Following his emergency room visit, Murach had two additional flare ' ups in January 2017, one more severe than the other. Both times, Murach was

denied transportation to the emergency room by DOC personnel including but not limited to Defendants Pierce, Parker, and Scarborough. Again, the on call Physician Assistant intervened to ensure transportation to ER.

54.    Throughout his incarceration, both Murach and his father consistently requested he undergo a colonoscopy.

55.    Defendants CCS, Connections, Defendants Pierce, Parker, and Scarborough continually promised Murach he would receive a colonoscopy. Despite these promises, Murach only received one examination in 2013.

56.    On January 18, 2017, Murach's Father was told he would receive a colonoscopy in February. He was also told his son would be evaluated for the medications Remicide and Humira to treat his Crohn's Disease.

57.    On February 1, 2017, a prison wide riot took place at JTVCC and a lock down occurred. After the riot, Defendants Pierce, Parker, Scarborough implemented a new policy where medically necessary outside treatment visits were dramatically curtailed in the name of security.

58.    On February 6, 2017, Murach visited with Dr. Caruso for a consultation for a colonoscopy.

59.    After the consultation, Defendants Pierce, Parker, Scarborough along with Connections failed to schedule him for a colonoscopy.

60.    Connections also failed to follow through on Murach's medical testing

and evaluations to treat his Crohn's Disease.

61.     A February 6, 2017 note from Connections medical records reference scheduling a colonoscopy for Murach in May- three months later, not in February as requested by the GI.

62.     On February 27, 2017, Murach completed a "sick call" form to Connections inquiring the status of his colonoscopy. [11]

63.     As of March 1, 2017, Murach's colonoscopy was still not approved by the JTVCC's review board. [12]

64.     After the riot, Murach was taken to the infirmary instead of the gastroenterologist or emergency room to address his illness.

65.     During his times in the infirmary, Murach was hooked up to an IV and the bag would be drained out for hours before it was replaced. Murach saw an extreme weight loss which was never addressed. Murach did not receive the standard medical care necessary to treat his illness at the infirmary.

## MURACH'S MARCH 9, 2017 VISIT TO EMEGENCY ROOM

66.     On March 9, 2017, Murach experienced another flare up from his Crohn's Disease. Murach experienced increasing and worsening extreme abdominal pain and vomiting.

67.     Connections' physician assistant waited until the pain was at its most

---

11 2/27/17 Connections Sick Call Form.

severe (three hours) before requesting permission from Defendants Pierce and Parker to transfer Murach to the emergency room.

68.    Eventually Murach was transported to the emergency room after Defendant Parker begrudgingly gave permission.

69.    Bayhealth medical records show that Murach was supposed to see Dr. Caruzo for a colonoscopy with 1-2 months and start treatment with remicade and humira.

70.    A CT Scan again showed irregular thickening of the wall the colon as seen in the region of the proximal transverse colon.

71.    Murach's final diagnosis was Crohns colitis w/ intestinal obstruction. stricture intestinal, abdominal pain, unspecified location.

72.    Murach was discharged on March 12, 2017 and prescribed Humira and Predinsonlone.

73.    After Murach was discharged, Connections failed to refill his prescriptions of Humira as dictated by Bayhealth.

74.    On April 3, 2017, Murach had another flare up when Connections staff sent him to the infirmary instead of the emergency room by order of Defendants Pierce and Parker.

75.    On April 6, 2017, Murach had another flare up. Connections medical

---

12 Page 21 of Connections Medical Records.

staff failed to order his Humira and instead gave him pain medication which simply masked his Crohn's symptoms.

76.    Despite continued promises by Connections medical staff, Murach still had not received a colonoscopy.

## MURACH'S APRIL 15, 2017 VISIT TO EMEGENCY ROOM

77.    On April 15, 2017, Murach had another flare up and was sent to Kent General. Surgeon Dr. Kevin Geffe informed Murach his intestines were so badly damaged that the scar tissue had narrowed his bowels very severely, required surgery and possibly a colostomy.

78.    Dr. Kevin Geffe noted in the medical records, "Patient came to emergency room with acute onset abdominal pain and was found to have gross peritonitis. Massive obstruction in colon upon CT scan and fluid with the pelvis. Need to proceed for exploratory laparotomy."[13]

79.    Dr. Geffe expressed his concerns and professional recommendations to guards as well as the patient.

80.    Dr. Geffe stated that if they waited until Murach had another flare-up, a much more complicated emergency surgery would be required and Murach might be forced to wear a colostomy bag.

82.    Due to a loss of blood, Murach required a blood transfusion.

---

13 An exploratory laparotomy is a surgical operation where the abdomen is opened and the abdominal

83.     On April 15, 2017, Murach's bowel complication/restriction became so severe that Dr. Kevin T.C. Geffe decided emergency surgery was necessary.

84.     On April 19, 2017, Murach's diagnosis was changed from Crohn's disease to Ulcerative Colitis.

85.     On April 20, 2017, Murach was diagnosed with Stage 3 colon cancer.

86.     Dr. Geffe communicated with Defendant Warden Pierce about Murach's cancer diagnosis. Due to the severity of the diagnosis. Dr. Geffe requested Murach's parents be present at his bedside when he delivered the news about his cancer.  Defendant Pierce denied Dr. Geffe's request. [14]

87.     On May 16, 2017, an MRI was taken of Murach where it was revealed that Murach's cancer had mediatized to his liver and was upgraded to Stage 4 colon cancer.

88.     Dr. Geffe reported in Murach's medical records that he had a "Specific concern that patient was in protective correctional custody over the past six years and had not received adequate medical care according to standard of care which subsequently led him to the diagnosis that he currently holds." [15]

89.     Dr. Geffe expressed his "ethical concerns regarding my duty of care to the patient and the knowing circumstances that should I discharge him back to the Department of Corrections they will not be able to give him the care that he

organs examined for injury or disease.

needed." [16]

90.     At least 7 times between December 2016 and April 2017 , Murach had severe emergency medical events where medical care was delayed or denied, medications not correctly prescribed, and transportation was unnecessarily delayed or denied to Kent General Hospital by defendants CCS, Connections, Pierce, Parker, & Scarborough.

91.     Murach was seen several times from November 2016 to April 2017 with complaints of abdominal pain and rectal bleeding in the Bayhealth Kent General Emergency Room.

92.     Each time, CT scans were done and stated that there was a "stricture" which we now know was a tumor and not a stricture.

93.      The CT scan results were consistent with each other and demonstrated the possibility of a tumor being present.

94.     Bayhealth doctors and medical staff were aware of the CT scan results and failed to take action which would have diagnosed the tumor sooner and diagnosed Murach's colon cancer at a much earlier stage.

95.     As a result of Bayhealth's actions, diagnosis and treatment of Murach was delayed.

---

14 Page 637 of Bayhealth medical records.
15 Page 637 of Bayhealth medical records.
16 Page 638 of Bayhealth medical records.

96.     As a result of Murach's dire circumstances, a court order was entered releasing Murach to receive proper medical care.

97.     Dr. Geffe contacted an oncologist and colorectal surgeon in Murach's home state of Virginia to ensure Murach received proper medical care upon release.

98.     Entering JTVCC, Murach was 185 lbs. After visiting Kent General three times, Murach lost about 40 lbs in a month in a half.  This weight loss occurred from February 13, 2017 to April 13, 2017.

99.     Dr. Kevin Geffe stated in a letter to the Court that "that all of the above issues would have been avoided if Defendants CCS and Connections had conducted standard medical tests, annual colonoscopies, and given Murach the proper medications."

## COUNT I – 42 U.S.C. § 1983
## (AGAINST DEFENDANTS CONNECTIONS, PIERCE, PARKER, & SCARBOROUGH)

99.     Plaintiff reincorporates all preceding allegations as though they are fully stated in this Count.

100.    Defendants Scarborough, Parker, and/or Pierce, individually and/or collectively, were responsible for approving the transportation of inmates to outside medical facilities.

101.    Defendants Scarborough, Parker, and/or Pierce knew that Murach suffered from Crohn's Disease and diabetes upon his incarceration at JTVCC.

102.    Defendants Scarborough, Parker, and/or Pierce blocked Murach's colonoscopy and medical testing and evaluations to treat his Crohn's Disease.

103.    After the prison riot, Defendants Scarborough, Parker, and/or Pierce put the security concerns of JTVCC ahead of Mr. Murach's health needs.

104.    Murach's medical issues could have been avoided if Defendants Scarborough, Parker, and/or Pierce had authorized and allowed standard medical tests, annual colonoscopies, or given Murach the proper medications.

105.    Despite requests from Murach, Murach's family, and possibly employees of Defendant Connections, Defendants Scarborough, Parker, and/or Pierce, individually and/or collectively, refused to approve and/or transport Murach for necessary medical care.

106.    In addition to dealing with the lack of care for Murach's Crohn's disease, Mr. Murach had to deal with numerous occasions where his diabetes medications Lantis and Humira were not ordered on time. Thus, Murach went days without his medications causing his blood sugars to spike to harmful levels for a diabetic.

107.    The actions of Defendants Connections, Scarborough, Parker, and/or Pierce, individually and/or collectively, were committed intentionally, recklessly, and/or with deliberate indifference to Murach's known medical need for prompt medical and/or surgical treatment.  These actions violated the prohibitions of cruel

and unusual punishment under the Eighth Amendment to the United States Constitution and Article I, Section 11 of the Delaware Constitution.

108.   Defendants Scarborough, Parker, and/or Pierce knew that the medical care provided at DCC was not meeting the appropriate standards of care, and that the treatment of inmates with serious medical needs by the medical vendors routinely violated their civil rights pursuant to 42 U.S.C. § 1983 and violated Murach's 8th amendment right to be free of cruel and unusual punishment.

109.   Scarborough, Parker, and/or Pierce have a non-delegable duty under the law to provide for the serious medical needs of inmates such as Joseph Murach. Colorectal cancer is a serious medical need.

110.   Scarborough, Parker, and/or Pierce knew that CSS and Connections were providing inadequate medical staffing for JTVCC and that as result it was impossible for the medical staff to even meet the treatment standards contained in their own policy manuals.

111.   Scarborough, Parker, and/or Pierce knew through the many grievances and legal complaints filed by many inmates including Murach, that Murach was not receiving adequate care from CCS and Connections for his serious medical condition of crohn's disease and colorectal cancer.

112.   As a direct and proximate result of these intentional, reckless, and/or deliberately indifferent acts, Murach suffered the injuries detailed in Paragraphs 1

through 111.

WHEREFORE, Plaintiff Joseph Murach respectfully requests this Court:

A.     Enter judgment in his favor and jointly and severally against Defendants CCS, Connections, James Scarborough, Phil Parker, and David Pierce;

B.     Award him compensatory, punitive, and special damages as he can prove;

C.     Award him pre- and post-judgment interest;

D.     Award him costs and attorney's fees; and

E.     Grant such other relief as the Court deems appropriate.

### COUNT II – 42 U.S.C. § 1983
### (AGAINST CCS AND CONNECTIONS)

113.   Plaintiff re-alleges paragraphs 1-112 as if fully stated herein..

114.   From July 1, 2014 to Murach's release, employees of CCS and Connections continuously breached the standards of care for screening Murach for colon cancer and treating Murach's Crohn's Disease, diabetes, and/or chronic colitis.

115.   CCS and Connections employees violated applicable community medical standards, the standards set forth by the American Academy of Family Physicians, the standards established by the American Cancer Society, the standards of the American College of Gastroenterology, the standards on the Delaware Department of Health and Social Services websites, and all other appropriate

standards listed of care applicable to screening for, diagnosing, and treating Crohn's Disease, diabetes, chronic colitis, and diagnosing colon cancer.

116.   CCS and Connections acted negligently, intentionally, wantonly, and willfully toward Murach in the following ways:

a)   They failed to give an annual colonoscopy pursuant to the appropriate standards and guidelines knowing that Murach, suffering from Crohn's disease, was at a high risk for colon cancer. By not properly treating Murach's Crohn's Disease, Mr. Murach's intestinal disorder (which developed into colon cancer), diabetes, and severe weight loss until his flare-ups intensified to the extent he needed emergency surgery.

b)   They failed to order the colonoscopy even after Mr. Murach's prior medical provider required an annual colonoscopy knowing that such failure could allow colon cancer to develop, metastasize and become incurable.

c)   They failed to make timely referrals for treatment of Murach's Chrohn's Disease, intestinal disorder, allowing cancer to develop and metastasize in his liver, further complicating his treatment and decreasing his chance for a cure.

d)      They put the financial concerns of CCS and Connections ahead of Mr. Murach's health needs.

e)      They failed for months to provide proper treatment and tests that would have identified the cancer.

g)      They failed to respond in a timely manner to his legitimate medical grievances.

117.   CCS and Connections were deliberately indifferent to Murach's serious medical needs in a way which violated his civil rights pursuant to 42 U.S.C. §1983, and which violated his 8th Amendment right to be free of cruel and unusual punishment.

118.   On several occasions, the delay in emergency transportation caused Murach to experience severe pain to the point of where he was bent over in a bed on the floor.

119.   Since Murach's release from JTVCC, he has had 50% of his liver removed, colon removed, finished 12 chemo treatments, another 4 chemo treatments remaining, additional tumors have developed on left side of liver requiring stronger chemo medication, and additional sugar to ablate the new tumors.

120.   As a result of the continuous violations of his civil rights by CCS/Connections and its employees and the negligent and intentional actions of Connections employees, Murach has suffered the following injuries:

21

a)    He has suffered tremendous physical, mental, and emotional pain and anguish from the time that his symptoms of colon cancer became evident.

b)    He has had to undergo a greater/more invasive surgery and more chemotherapy then if his cancer had been timely diagnosed and treated.

d)    His chance to be successfully treated and cured of his colon cancer has been substantially diminished by the delay in care and treatment.

e)    He has a substantially increased risk of premature death because of the delay in diagnosis and treatment of his colon cancer.

f)    He has incurred medical expenses that may not have been incurred had his cancer been diagnosed and treated in a timely manner.

**WHEREFORE**, Murach demands judgment against CCS and Connections, such special damages as he can prove, general damages, punitive damages, attorney's fees pursuant to 42 U.S.C. § 1983, costs of the action, and such other relief as the Court deems appropriate.

### COUNT III– 42 U.S.C. § 1983
### MEDICAL MALPRACTICE
### (AGAINST CCS AND CONNECTIONS)

121.   Paragraphs 1 to 120 are restated as if fully set forth herein.

122.    Defendants CCS and  Connections Community Support Programs, Inc., including their agents, apparent agents, servants, and ostensible agents were negligent and violated the applicable standard of care in violation of 18 Del. C. Chapter 68.

123.    As trained medical providers, CCS and Connections employees were negligent in the care of Plaintiff and the medical care and services they rendered to Plaintiff did not measure up to that degree of care and skill ordinarily employed in a similar circumstance by members of their specific medical specialty. Specifically, CCS and Connections employees failed to meet the standard of care in that they:

a. Failed to properly care for Plaintiff, including failing to report Plaintiff's complaints to a physician;

b. Failed to anticipate the needs of Plaintiff;

c. Failed to properly diagnose and treat Plaintiff;

d. Failed to provide adequate medical care to Plaintiff; and

e. Were further negligent in such other and further particulars as the evidence may show.

124.    Plaintiff was made to suffer, unnecessarily and devastatingly, due to the negligence of defendants CCS and Connections, through their agents, servants and/or employees, who as trained medical practitioners, were negligent in their care of plaintiff in that the medical care and services that defendants rendered to plaintiff

23

did not measure up to that degree of care and skill ordinarily employed in a similar circumstance by members of the medical profession in that they negligently and continuously:

a) all of their actions as described above.

b) an obvious and blatant neglect and deviation from the standard of care regarding a patient that has a form of inflammatory bowel disease, a patient who presents with rectal bleeding, severe abdominal pain, etc.

c) Moreover, when Dr. Carr from Connections testified in the motion hearing releasing Murach from DOC custody, he himself went on record to say that he agreed with Dr. Geffe's clinical impression, summation, and treatment plan that was presented to the Court, and further stipulated that Connections and the Delaware Department of Corrections did not have the resources to take care of Murach.

125.   The aforesaid actions of the defendants constituted medical malpractice, caused great pain, suffering, and physical injury to Murach.

**WHEREFORE**, Plaintiff demands judgment be entered in his favor against defendants on the above claims, including awards for compensatory damages, punitive damages, damages for emotional distress, damages for pain and suffering, lost wages, fringe benefits, front pay, special damages, medical expenses, costs of this action, Attorney's fees, expert fees, pre-judgment interest, post-judgment

interest, and any other just and equitable relief as this Court deems proper.

**COUNT IV**
**MEDICAL NEGLIGENCE AGAINST BAYHEALTH MEDICAL CENTER**

126.   Plaintiff realleges paragraphs 1 through 125 in their entirety and incorporate them herein by reference.

127.   Defendant Bayhealth including their agents, apparent agents, servants, and ostensible agents were negligent and violated the applicable standard of care in violation of 18 Del. C. Chapter 68.

128.   As trained medical providers, Bayhealth employees were negligent in the care of Plaintiff and the medical care and services they rendered to Plaintiff did not measure up to that degree of care and skill ordinarily employed in a similar circumstance by members of their specific medical specialty. Specifically, Bayhealth employees failed to meet the standard of care in that they:

a. Failed to properly care for Plaintiff, including failing to report Plaintiff's complaints to a physician;

b. Failed to anticipate the needs of Plaintiff;

c. Failed to properly diagnose and treat Plaintiff;

d. Failed to provide adequate medical care to Plaintiff; and

e. Were further negligent in such other and further particulars as the evidence may show.

129.   Plaintiff was made to suffer, unnecessarily and devastatingly, due to the negligence of defendant Bayhealth, through their agents, servants and/or employees, who as trained medical practitioners, were negligent in their care of plaintiff in that the medical care and services that defendants rendered to plaintiff did not measure up to that degree of care and skill ordinarily employed in a similar circumstance by members of the medical profession in that they negligently and continuously:

a) all of their actions as described above.

b) an obvious and blatant neglect and deviation from the standard of care regarding a patient that has a form of inflammatory bowel disease, a patient who presents with rectal bleeding, severe abdominal pain, etc.

c) Murach was seen numerous times from November 2016 to April 2017 with complaints of abdominal pain, rectal bleeding, etc in the ED.

d) He was seen in consultation by GI and Surgeon at Kent General Hospital.

e) Several CT scans were done and stated that there was a "stricture" which was actually tumor and not a stricture.

f) Additionally his CT scan did not look different when it was seen by Dr. Geffe on April 15, 2017 from the previous ones.

g) It was a deviation of the standard of care that Bayhealth did not treat Murach in a more expeditious manner, like admitting him and doing a scope and

other medical options.

130.   As a result of these continuous failures by Bayhealth and its employees and the negligent and intentional actions of Bayhealth employees, Murach has suffered the following injuries:

a)   He has suffered tremendous physical, mental, and emotional pain and anguish from the time that his symptoms of colon cancer became evident.

b)   He has had to undergo a greater/more invasive surgery and more chemotherapy then if his cancer had been timely diagnosed and treated.

d)   His chance to be successfully treated and cured of his colon cancer has been substantially diminished by the delay in care and treatment.

e)   He has a substantially increased risk of premature death because of the delay in diagnosis and treatment of his colon cancer.

f)   He has incurred medical expenses that may not have been incurred had his cancer been diagnosed and treated in a timely manner.

**WHEREFORE**, Plaintiff demands judgment be entered in his favor against defendants on the above claims, including awards for compensatory damages, punitive damages, damages for emotional distress, damages for pain and suffering,

lost wages, fringe benefits, front pay, special damages, medical expenses, costs of

this action, Attorney's fees, expert fees, pre-judgment interest, post-judgment

interest, and any other just and equitable relief as this Court deems proper.

**BROWN SHIELS & BEAUREGARD, LLC**

/s/ Ronald G. Poliquin, Esquire
Ronald G. Poliquin, Esquire
148 South Bradford Street
Dover, DE 19904
(302) 734-4706
Bar ID No.: 4447
*Attorney for Plaintiff Joseph E. Murach*

Date: March 16, 2018